# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                   No. CR 16-4080 RB

CECILIO IBARRA-SANDOVAL,

    Defendant.

## MEMORANDUM OPINION AND ORDER

"Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1, cmt. n.27(c). Commensurate with that theory, the United Sentencing Commission imposed harsher sentencing Guidelines ranges for crimes involving drugs of high purity, which is why Defendant Cecilio Ibarra-Sandoval faces a Guidelines range of 63–78 months imprisonment for trafficking methamphetamine instead of the 46–57 month range he would have faced had the methamphetamine been less pure. The problem, however, is that Mr. Ibarra-Sandoval neither played a prominent role in the drug enterprise, nor was he in close proximity to the source of the drugs—he was a low level courier who didn't even know what drug he was transporting. Because the Court refuses to punish a low-level courier with a sentence intended for high-level criminals, the Court uses the 46–57 month Guidelines range and imposes a sentence of 46 months, as well as a mandatory assessment of $200.

## I. BACKGROUND

Born in Mexico, Defendant Cecilio Ibarra-Sandoval moved to Albuquerque, New Mexico, when he was 17. (Presentence Investigative Report (PSR) ¶¶ 40–41.) During his time in New Mexico, Mr. Ibarra-Sandoval ran his own furniture business for ten years and also worked in construction. (Doc. 39 at 3.) Mr. Ibarra-Sandoval is a husband and the father of two young children, one 11 years old and the other eight. (*See* PSR ¶ 43.) In 2007, Mr. Ibarra-Sandoval and his wife lost a third child at childbirth due to physician negligence. (PSR ¶ 44.) Mrs. Sandoval, Mr. Ibarra-Sandoval's wife, receives Social Security Disability Insurance for low back pain and diabetes, and she also relies on food stamps to support herself and the couple's two children. (PSR ¶ 43.) Mr. Ibarra-Sandoval's family has endured severe financial difficulties since his arrest on July 14, 2016. (*See* Doc. 39 at 3.)

On July 14, 2016, Jose Luis Adriano-Mascarro picked up Mr. Ibarra-Sandoval to go to El Paso, Texas. (*See id.* at 2.) Mr. Adriano-Mascarro was a friend of Mr. Ibarra-Sandoval, and the two men had previously worked together to smuggle undocumented aliens. (*See id.*) On this occasion, Mr. Ibarra-Sandoval thought he was going with Mr. Adriano-Mascarro to pay off an alien smuggler. (*Id.*) Unbeknownst to Mr. Ibarra-Sandoval, Mr. Adriano-Mascarro had arranged to pick up drugs in El Paso and to deliver the drugs to Las Cruces, New Mexico. (*See id.*) In El Paso, Mr. Adriano-Mascarro drove to a gas station and told Mr. Ibarra-Sandoval to retrieve a package—two clear plastic containers wrapped in black electrical tape—from another vehicle. (*Id.*) At this point, Mr. Ibarra-Sandoval knew that he was picking up contraband, but he didn't know the contents of the package. (*See id.*) Mr. Ibarra-Sandoval collected the package from a light blue vehicle at the gas station, and he and Mr. Adriano-Mascarro headed for Las Cruces. (PSR ¶ 14.) On their way to Las Cruces, a Metro Narcotics officer pulled over Messrs. Adriano-

Mascarro and Ibarra-Sandoval. (*Id.* ¶ 10.) The officer discovered a small amount of cocaine on Mr. Ibarra-Sandoval and 2.27 kilograms of methamphetamine in the package. (*See id.*) Both Messrs. Adriano-Mascarro and Ibarra-Sandoval were arrested and indicted.

On February 1, 2017, Mr. Ibarra-Sandoval pled guilty to Conspiracy to Possess with Intent to Distribute 500 Grams and More of a Substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine and Aiding and Abetting, in violation of 21 U.S.C. § 841(a)(1)(A) and 18 U.S.C. § 2. (Doc. 42 at 1.) Initially, the Government used the methamphetamine-mixture formula to calculate the recommended Guidelines range of 46–57 months. (*Id.*) After receiving a laboratory report indicating that the methamphetamine in the package was 98.1 percent pure, however, the Government recalculated the recommended Guidelines range based on the purity of the methamphetamine, leading to a new range of 63–78 months. (*Id.* at 1–2.) Mr. Ibarra-Sandoval now asks the Court to reject the new 63–78 month range and base his sentence on the methamphetamine-mixture range of 46–57 months.

## II.　LEGAL STANDARD

As a matter of administration and to ensure consistency, a district court should begin all sentencing proceedings by calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). Post *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are advisory, *see id.* at 227, and serve as a "starting point" and "initial benchmark," *see Gall*, 552 U.S. at 49. Although the Guidelines are afforded "respectful consideration," *see Kimbrough v. United States*, 552 U.S. 85, 101 (2007), a district court must not presume that the Guidelines range is reasonable. *See Gall*, 552 U.S. at 50. Instead, the district court must independently

consider all the sentencing factors in 18 U.S.C. § 3553(a) to determine the appropriate sentence. *See id.* at 49–50.

If the district court finds that the § 3553(a) factors support an outside-Guidelines sentence, it may deviate from the Guidelines. *See Rita v. United States*, 551 U.S. 338, 351 (2007). Permissible deviations include variations "based solely on policy considerations, including disagreements with the Guidelines." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The Supreme Court emphasized this last point in *Spears v. United States*, 555 U.S. 261 (2009), when it reiterated that policy deviations from the Guidelines need not be based on a particular defendant's individual circumstances; all that is needed to justify a variance—even in a mine-run case—is the sentencing court's disagreement with the Guidelines. *See id.* at 263–64.

Any sentence the district court imposes must be reasonable. *See Gall*, 552 U.S. at 51 (appellate courts review district court sentences for reasonableness). If the court imposes a sentence outside the Guidelines, it "must consider the extent of the deviation to ensure that the justification is sufficiently compelling to support the degree of variance." *See id.* The sentencing court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *See id.*

### III. DISCUSSION

#### a. *The Guidelines range*

A district court's sentencing analysis begins with the Guidelines range. *See Gall*, 552 U.S. at 49. Based on Mr. Ibarra-Sandoval's guilty plea, his initial base offense level is 36. *See* U.S.S.G. § 2D1.1(c). Following § 2D1.1(a)(5), the Court lowers Mr. Ibarra-Sandoval's base offense level by three because he qualifies for a mitigating role adjustment under § 3B1.2. Next, the Court finds that Mr. Ibarra-Sandoval meets the criteria set forth in § 3553(f) and

4

§ 5C1.2(a)(1)–(5), and the Court lowers his offense level by two pursuant to § 2D1.1(b)(17) and sentences Mr. Ibarra-Sandoval without regard to any mandatory minimum sentence. Because Mr. Ibarra-Sandoval was a minor participant, the Court lowers the offense level by two, *see* U.S.S.G. § 3B1.2(b), and the Court further lowers the offense level by two because Mr. Ibarra-Sandoval accepted responsibility for the offense, *see* U.S.S.G. § 3E1.1(a). Finally, following U.S.S.G. § 3E1.1(b), the Court lowers the offense level by one because Mr. Ibarra-Sandoval notified authorities in a timely manner of his intention to enter a guilty plea. Mr. Ibarra-Sandoval's resulting total offense level is 26. Mr. Ibarra-Sandoval has no prior criminal convictions, so he is in criminal history category one. A total offense level of 26 and a criminal history category of one correspond with a Guidelines range of 63–78 months imprisonment.

### b. *The methamphetamine Guidelines are not based on empirical data*

Congress created the United States Sentencing Commission and tasked the Commission with establishing sentencing policies that meet the "multiple purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), to provide certainty and fairness, to avoid unwarranted sentencing disparities, to seek proportionality, and to reflect advancement of knowledge of human behavior." *United States v. Hayes*, 948 F. Supp. 2d 1009, 1018 (N.D. Iowa 2013) (citing Pub.L. No. 98–473, §§ 217(a), 239, 98 Stat. 1987 (1984); 28 U.S.C. § 991(b)(1)). In meeting its mandate, the Commission faced philosophical conflict among its members, including conflict between members who emphasized moral culpability and "just punishment," and those who stressed the need for "crime control." *See Rita*, 551 U.S. at 349 (citations omitted). Rather than pick a side, the Commission compromised with an empirical approach: it examined 10,000 presentence reports showing how judges had handled sentencing in the past, and then the Commission modified past practice "in the interest of greater rationality, avoiding inconsistency,

complying with congressional instructions, and the like." *See id.* Because the resulting Guidelines are the product of the Commission's intensive efforts and careful study, a district judge must accord "serious consideration" to the Guidelines ranges. *See Gall*, 552 U.S. at 46.

Crucially, however, the Commission did not follow its ordinary empirical process in setting the Guidelines range for drug offenses. *Gall*, 552 U.S. at 46 n.2. Following the death of University of Maryland basketball star Len Bias from a drug overdose on June 19, 1986, Congress hastily enacted the Anti-Drug Abuse Act of 1986 (ADAA). *United States v. Diaz*, No. 11-CR-00821-2 JG, 2013 WL 322243, at *4–5 (E.D.N.Y. Jan. 28, 2013). The ADAA established a two-tiered system with five and ten-year mandatory minimum sentences for drug offenses. *Id.* Which tier a defendant fell into depended on the drug type and quantity involved in the crime. *Id.* As Senate Minority Leader Robert Byrd explained during floor debate, the ADAA's two-tiered structure was designed to punish certain categories of drug traffickers, such as kingpins and organizers:

> For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. If it is their first conviction, the minimum term is 10 years. . . . Our proposal would also provide mandatory minimum penalties to the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years for the first offense.

U.S. Sentencing Comm'n, Special Report to Congress: Cocaine and Federal Sentencing Policy 119 (Feb. 1995) (citing 132 Cong. Rec. S. 14,300 (Sept. 30, 1986)); *see also Hayes*, 948 F. Supp. 2d at 1020–21. By using drug type and quantity as a proxy for criminal role, Congress opened the door for low-level drug offenders who happened to have a certain drug type or quantity to suffer punishments intended for kingpins and organizers. *See Diaz*, 2013 WL 322243, at *5.

6

Perhaps bowing to political pressure, *see Hayes*, 948 F. Supp. 2d at 1022, the Commission chose not to use its usual empirical approach to determine the appropriate Guidelines sentences for drug offenses, *Gall*, 552 U.S. at 46 n.2. Instead, the Commission simply keyed the Guidelines range to the statutory mandatory minimum sentences Congress established for drug crimes, *see id.*, despite the fact that the resulting Guidelines sentences would be "much more severe than the average sentences previously meted out to drug trafficking offenders . . . ." *Diaz*, 2013 WL 322243, at *5. Consequently, the drug offense Guidelines are not a reflection of the Commission's institutional strengths, and a district court has more discretion to vary from the drug offense Guidelines based on policy disagreements than in a case where the applicable guidelines were promulgated pursuant to the Commission's usual empirical approach. *See Kimbrough*, 552 U.S. at 89 ("closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view . . . The crack cocaine Guidelines, however, present no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role.").

The Government argues that the Court should still defer to the drug offense Guidelines because the Guidelines are an expression of Congressional policy. (*See* Doc. 45 at 3.) The Government made the same argument in *Kimbrough*. *See Kimbrough*, 552 U.S. at 102 (Government opposed varying from drug offense Guidelines because the Guidelines reflect a "specific policy determination that Congress has directed sentencing courts to observe."). In *Kimbrough*, the Government buttressed its Congressional policy claim by making three additional arguments: (1) the ADAA prohibits both the Commission and the district courts from disagreeing with the drug-sentencing ratio, *see id.*, (2) Congressional rejection of the Commission's proposed Guidelines amendment in 1995 illustrates Congress's persistence in

7

upholding its drug sentencing determinations, *see id.* at 105, and (3) disparities will plague drug sentences if district courts are free to deviate from the Guidelines based on policy disagreements, *see id.* at 106–07. The Supreme Court in *Kimbrough* rejected all three of the Government's arguments. *See id.* at 102–08.

Unlike the case in *Kimbrough*, here the Government adds no additional arguments to support its claim that the drug Guidelines are an expression of Congressional policy. This leaves the Government in the same position it was in after the Supreme Court rejected the Government's three supporting arguments in *Kimbrough*. To the extent that the drug offense Guidelines are an expression of Congressional policy, then, that was true in *Kimbrough* as well, and that fact did not prevent the *Kimbrough* Court from giving district courts the power to deviate from the Guidelines based on policy disagreements. *See Kimbrough*, 552 U.S. at 101.

The Government also contends that it is "rational" for the Sentencing Commission to distinguish between mixture and actual methamphetamine. (Doc. 45 at 3.) The Court certainly hopes so. But the Supreme Court in *Kimbrough* did not say that a district court could only vary from the Guidelines if the Commission had no rational basis for its actions. In fact, the Commission surely had a rational basis for distinguishing between powder and crack cocaine in *Kimbrough*, but that did not prevent the Supreme Court from upholding the district court's variance from the Guidelines. Nor will the Commission's rational basis for distinguishing between mixture and actual methamphetamine prevent the Court here from deviating from the Guidelines based on policy disagreement.

As described above, the Court began its sentencing determination in this case by calculating the applicable Guidelines sentence. The Court uses the Guidelines as an anchor and gives the Guidelines due consideration. However, the Court must independently consider the

8

§ 3553(a) factors and will vary from the Guidelines if it finds that a different sentence better accomplishes the goals of § 3553(a).

### c. Consideration of the § 3553(a) factors and policy disagreement with the Guidelines

Methamphetamine is a stimulant drug, usually in the form of a white powder or pill, that can be inhaled, swallowed, snorted, or injected. *Methamphetamine*, National Institute on Drug Abuse, https://www.drugabuse.gov/publications/drugfacts/methamphetamine (last visited Sept. 19, 2017). Unlike most other illegal drugs, methamphetamine can be manufactured in a laboratory, and Mexican cartels are increasingly seizing control of the entire distribution line, from manufacture to actual distribution. Mike Gallagher, *The Cartels Next Door: Mexican drug lords corner meth market*, Albuquerque Journal, https://www.abqjournal.com/950174/next-door.html (last visited Sept. 19, 2017). As a result of increased cartel control over methamphetamine distribution, the average purity of methamphetamine has increased to over 90 percent while the price per gram has dropped to about $70:



9

2013 National Level STRIDE Price and Purity Data, at 4; *see also* Gallagher, *The Cartels Next Door*. Tragedy and hardship have followed the increased availability of purer methamphetamine. In 2014, there were 111 deaths due to methamphetamine overdose in New Mexico, up from 23 in 2008. *See* Gallagher, *The Cartels Next Door*. Increased methamphetamine use has also lead to a rise in violence as cartels jockey for control of the market. *See id.* Because of the problems associated with methamphetamine, the Court takes crimes involving methamphetamine seriously. However, the Court bears in mind its mandate not only to impose sufficient punishment, but also to ensure that punishment is "not greater than necessary." *See* § 3553(a).

On August 29, the United States Probation Office received a laboratory report indicating that the methamphetamine Mr. Ibarra-Sandoval was carrying was 98.1 percent pure. (Doc. 44.) Because the methamphetamine was over 80 percent pure, it was considered methamphetamine-actual instead of methamphetamine-mixture for sentencing purposes, and Mr. Ibarra-Sandoval's offense level increased by three levels, adding at least 17 months to his sentence. After analyzing all the § 3553(a) factors and the facts of this case, the Court believes that the Guidelines range (1) fails to reflect Mr. Ibarra-Sandoval's true culpability and (2) treats Mr. Ibarra-Sandoval differently from similarly-situated defendants.

The underlying theory behind increasing a defendant's sentence based on drug purity is that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." § 2D1.1, cmt. n.27(c). The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution. However,

the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality. As illustrated above, the average purity of methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true.

Case in point is Mr. Ibarra-Sandoval. Far from having a prominent role, Mr. Ibarra-Sandoval was a low-level courier who didn't even know the contents of the bag he carried except that they contained drugs. That Mr. Ibarra-Sandoval happened to have the misfortune of trafficking in methamphetamine-actual instead of the less heavily punished methamphetamine-mixture does not change his level of culpability. To apply the sentence enhancement for purity to Mr. Ibarra-Sandoval would result in a "classic case of false uniformity." *See United States v. Cabrera*, 567 F. Supp. 2d 271, 273 (D. Mass. 2008). "False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors." *Id.* If the Court followed the Guidelines and increased Mr. Ibarra-Sandoval's sentence by at least 17 months, it would be guilty of false uniformity by allowing a single consideration, drug purity, to mask Mr. Ibarra-Sandoval's true role in the crime. This false uniformity would cause the Court to sentence Mr. Ibarra-Sandoval to a punishment meant for another.

Additionally, today's high average methamphetamine purity means that most defendants would be sentenced according to the harsher methamphetamine-actual Guidelines when the methamphetamine is tested for purity. *See* United States Sentencing Commission, Methamphetamine, Final Report 1999, at 15. However, drugs are not tested in all cases. Chief Judge Winmill explains:

> The reasons why testing is or is not performed in any case are completely arbitrary. In many cases, only some of the drugs were seized and available for testing. In others, the testing lab was too busy to complete testing before sentencing. In some, the wise defendant pled guilty early in the case so that sentencing would occur before testing could be completed. In many cases, the prosecution originated with a state agency where testing could not be completed in a timely manner. Regardless, none of these reasons relate to the defendant's culpability or the danger which he or she poses to society.

*United States v. Hartle*, No. 4:16-CV-00233-BLW, 2017 WL 2608221, at *3 (D. Idaho June 15, 2017). The high average purity of methamphetamine combined with the arbitrary nature of testing means that sentencing enhancements for drug purity are applied capriciously. Of course, where testing has already been performed, the Court will not ignore the drug purity information. The Court will, however, determine whether an enhancement based on purity is appropriate in each case. Based on the above analysis, the Court concludes that an enhancement based on drug purity for Mr. Ibarra-Sandoval would be unconnected to culpability and treat Mr. Ibarra-Sandoval differently from similarly-situated defendants for purely arbitrary reasons.

After considering all the § 3553(a) factors, the Court holds that a sentence of 46 months is sufficient, but not greater than necessary, to fulfill the purposes of § 3553(a). This sentence would have fallen within the Guidelines range had Mr. Ibarra-Sandoval been sentenced under the methamphetamine-mixture calculation, and the Court believes a sentence within the methamphetamine-mixture range is appropriate both because Mr. Ibarra-Sandoval is no more culpable than the mine-run defendant who would have been sentenced under the methamphetamine-mixture range, and because the Commission believed the methamphetamine-mixture range was sufficient to punish those aforementioned mine-run defendants. The sentence imposed varies from the Guidelines range by at least 17 months, but this variation is compelled by the Court's policy disagreement with the Guidelines range, which neither reflects Mr. Ibarra-Sandoval's culpability nor treats him the same as most similarly-situated defendants.

## IV. CONCLUSION

The Sentencing Commission's work is ongoing, *Rita*, 551 U.S. at 350. The continued evolution of the Guidelines to better accomplish its Congressional mandate depends on interplay between the sentencing judge and the appeals court and Commission. *See id.* Given that average street-level methamphetamine today is over 90 percent pure, the Guidelines range for methamphetamine creates a false uniformity between minor criminals and drug kingpins by focusing on drug purity instead of the defendant's role. This problem is exacerbated by the fact that purity testing, which will on average reveal a purity level that leads to a harsher sentence, occurs capriciously. In effect, the Commission asks the Court to sentence defendants to harsher sentences than they deserve for purely arbitrary reasons. This is not a result that comports with justice, and the Court today notes its policy disagreement with the methamphetamine Guidelines in the hopes that its discussion can help the Guidelines "constructively evolve over time, as both Congress and the Commission foresaw." *Id.* at 358.

**THEREFORE**,

The Court sentences Cecilio Ibarra-Sandoval to 46 months imprisonment, with no supervised release, and a mandatory special assessment of $200.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**